

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-17-00276-CV

———————————————

WILLIAM BLEVINS, Appellant

V.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Appellee

On Appeal from the 96th District Court
Tarrant County, Texas
Trial Court No. 096-259556-12

Before Walker, Kerr, and Birdwell, JJ.
Memorandum Opinion by Justice Kerr
Dissenting Memorandum Opinion by Justice Birdwell (to follow)

## MEMORANDUM OPINION

Presenting four issues, William Blevins appeals from an unfavorable jury verdict and resulting judgment on his declaratory-judgment action against State Farm Mutual Automobile Insurance Company for underinsured-motorist benefits. Blevins's first two issues present legal- and factual-sufficiency challenges to the jury's findings of zero damages; his third issue complains of the trial court's excluding testimony about the uninsured- and underinsured-motorist (UM/UIM) policy by quashing a trial subpoena for a State Farm corporate representative; and his final issue involves claimed jury-charge error. We affirm.

### Introduction

State Farm was the only defendant to go to trial after the two drivers whose cars each struck Blevins's settled with him. As in any underinsured-motorist case, Blevins needed to establish liability on the part of either or both of those settling drivers and to quantify his damages through a jury verdict and judgment. Only then, after applying any offsets and credits, might State Farm owe him money under his UIM policy. At its core, then, this was first and foremost a tort case.

At trial, Blevins did not put into evidence or seek to recover any out-of-pocket medical bills or repair costs, nor did he seek lost wages or recovery for any diminished earning capacity. Rather, his principal trial theory was that the wreck had caused a traumatic brain injury that had permanently diminished his cognitive abilities and affected his family relationships. The jury was asked only about damages for past and

future physical pain and mental anguish, past and future disfigurement, and past and future physical impairment.

The voluminous medical records put before the jury referred here and there to a bump on Blevins's head and associated swelling, to a concussion that was not serious and that resolved quickly, and to a leg abrasion. This handful of objective yet relatively insignificant injuries were barely mentioned in testimony, and mostly in the cross-examination of Blevins's expert, who had not, until over a lunch break at trial, reviewed Blevins's medical records or known about his past concussions, seizures, depression, severe sleep apnea, and other medical issues. The record does reveal that Blevins went all-in on a damage model based on a permanent traumatic brain injury that in the end did not convince the jury to award him any damages.

**Facts**

Blevins was involved in a multi-car wreck on October 2, 2011, losing consciousness temporarily at the scene but coming to before being removed from his car. He was taken by ambulance to Texas Health Harris Methodist Hospital in Fort Worth, where he was evaluated and sent home several hours later with a pain reliever and an anti-nausea medication.

*Blevins's medical history*

At the time of the wreck Blevins had been under a neurologist's care, and a January 2011 medical record from Texas Neurology in Dallas—written some nine months before Blevins's accident—summed up his medical history[1]:

> 53 yo WM RH seizures since September 2006
> On Memorial Day 2006, ear ache, then bacterial menengitis [sic], ICU
> Rehab
> Home then August 2006 diagnosed with [West Nile Virus] Violent tremor and diplopia
> September 2006, working in a hot warehouse, he felt hot, he passed out, he believes he fainted[.] Hit the concrete floor hard, struck left brow, concussion with loss of consciousness, but witness did not see a seizure[.] Then started having episodes of loss [of] strength, and falling backwards, whole body tingling, improved with laying down[.] Three episode[s] occurred over a few days after his fall in the warehouse . . .
> He has bilateral high frequency hearing loss[.] The hearing loss in his left ear may be more severe[.] He attributes the left ear hearing loss to a concussion he received when he was struck by his own car when someone ran into from behind and she [sic] fell back on the pavement hitting his head[.] This occurred in his early 20s[.]

As this medical history indicates, Blevins suffered two hospitalizations in 2006. The first time, Blevins spent ten days in the hospital with bacterial meningitis and, as he recounted at trial, "had to learn how to walk again, learn how to eat again." Blevins

---

[1]Unless the jury's attention was directed to parts of Blevins's medical records during the non-transcribed closing arguments, during the trial the jury heard very little of what was in those records, and even then not until State Farm cross-examined Blevins's expert. The jury could, of course, have theoretically combed through the voluminous records during its deliberations. We have independently reviewed those records as part of our evidentiary-sufficiency analysis and summarize their contents here as they relate to Blevins's appellate issues.

testified that his bout with meningitis manifested with a severe earache, an inability to write more than "gibberish," and episodic violence; he spent five days in intensive care strapped down and "really out of [his] mind." He then had the misfortune to be bitten by a mosquito shortly after being released from the hospital and contracted the first recorded case of West Nile virus in Tarrant County, leading to further hospitalization.

When he came down with West Nile virus, Blevins testified that he developed a "massive headache" and fever spikes along with a "shaking issue" that left him unable to hold a utensil and feed himself. By the end of 2006 Blevins was better "[b]ut [he] had a seizure . . . ." And as the above-quoted Texas Neurology record reveals, while Blevins was working in a hot warehouse in September 2006, he passed out and hit his head "hard" on the concrete floor.

Nonetheless, Blevins denied any ongoing neurological problems and felt that he had completely recovered by 2007. In addition, a past hearing issue was addressed when Blevins had tubes inserted into his ears while hospitalized in 2006, which enabled him to stop using hearing aids, although Blevins testified that the 2011 wreck caused those problems to resurface.

Medical Clinic of North Texas (MCNT) records dated October 6, 2006, that are contemporaneous with the onset of Blevins's seizure disorder give this additional information, as recorded by counselor Kathy Bailey, Ph.D.:

He fainted at work and, subsequently, he was laid off from his job. He had no disability insurance. This has placed the family into financial challenge.

On September 25, 2006, he was helping a friend with some bookkeeping work. He had a seizure and was, then, diagnosed with a seizure disorder. Since the seizure, Mr. Blevins has been hesitant to be without his spouse at his side. He has struggled with fears of the night because the darkness reminds him of uncertainty.[2]

Dr. Bailey's 2006 records also list, among "additional persistent symptomology," Blevins's tearfulness, anhedonia (inability to feel pleasure), difficulty in making decisions, fatigue, and sense of "impending doom."

As part of its January 2011 assessment and treatment of Blevins's seizure disorder, Texas Neurology referred Blevins to be evaluated for sleep apnea. Following testing, the Texas Neurology Sleep Disorders Center diagnosed Blevins with "Severe Obstructive Sleep Apnea."

Also in January 2011, Texas Neurology performed an MRI on Blevins's brain. The results of that test were "unremarkable." When Texas Neurology performed a repeat MRI on Blevins three days after his car wreck, the findings were explicitly "compared to MR dated 01/31/2011":

> The study is negative. There is no significant interval change. There is no imaging evidence of mesial temporal sclerosis. There is no evidence of any significant subcortical pathology. No evidence for pathologic contrast enhancement. Cerebral and cerebellar volume are appropriate for the patient's age. No microvascular ischemic changes present.

---

[2]Additionally, Dr. Bailey wrote that Blevins "described himself as, typically, a 'scammer' who can, eventually figure things out to get what he needs and wants."

6

SUMMARY: Negative MR evaluation of brain. No significant change from January exam.

Except for a neuropsychological evaluation done in 2013 at the request of Blevins's counsel after this suit was filed, no medical records from the day of or after the October 2, 2011 accident contain any observational entries or test results that would support Blevins's claim that the wreck resulted in an enduring "traumatic brain injury," as that phrase was used by his retained expert neuropsychologist, Andrew Houtz, Ph.D. But it was on such an injury that Blevins, his wife, and Dr. Houtz exclusively focused at trial, and for which Blevins sought compensation of at least $300,000.[3]

### The October 2, 2011 accident and its aftermath

Blevins did not remember anything about the wreck itself, although he recalled looking for his cell phone afterward. One witness from the scene testified that when she had first approached the car, Blevins was unresponsive; she feared he was dead.

---

[3]This was the number mentioned in opening statement, although plaintiff's counsel also opined that the damages were "several million dollars," which counsel encouraged the jury to award to "send a message by giving him the full amount of the damages, regardless of what you may think he'll actually get," and even though as the jury had "heard during voir dire, there's a limit. He purchased a certain amount of UM/UIM coverage." Neither Blevins nor any witness testified to a dollar amount of claimed damages, no medical bills were put into evidence, and closing arguments were not recorded. But as the trial judge remarked at the hearing on Blevins's new-trial motion, "As I recall, your arguments were he ought to be awarded a million dollars or up to a million dollars and no less than 300,000. And that was based upon this theory of a closed-head injury, which I think the jury could reject it."

After the witness unbelted Blevins's young son, Nathanael,[4] from the back seat and went to the front of the car, Blevins came to and said, "My son! My son!" The witness "could tell something was wrong" with Blevins because his eyes were open, but he was "not comprehending."

Blevins's first real recollection of interacting with anyone was when he was in the ambulance on the way to the hospital. The "Comments" section of MedStar records from that day indicate that Blevins had a "hematoma to head with repetitive questioning, with positive [loss of consciousness]" and that he complained of "head pain"; the hematoma (bruise) was described as "to top of head." Under the form's "Subjective" section, MedStar recorded head pain but "No Altered Mental Status"; Blevins was noted in the "Initial Assess – Objective" portion to have been alert to person, place, and time but also "confused."

Once at Harris Hospital, Blevins remembered riding on the gurney and also remembered the emergency-department doctor's reacting to a comment Blevins had made by responding "That was funny, especially the first time," or words to that effect.[5] Blevins testified that right after the accident, his shoulder and possibly "one of [his] knees or legs was hurting, [his] right leg, maybe," and that he had "quite a bit of

---

[4]Claims brought on Nathanael Blevins's behalf were settled before trial.

[5]Blevins points to this interchange as proof of a traumatic brain injury.

8

bruising" on his face from the air bag. No photographs of Blevins following the accident were introduced into evidence.

Consistent with MedStar's records, the medical records from the Harris Hospital Emergency Department indicate that Blevins arrived at the ED with a hematoma following the car wreck and that he was complaining of the "HA at the top of his head." Blevins had neck pain but no chest or abdominal pain; he stated that his "left thumb hurts when he moves it." Blevins was "alert and oriented to person, place, and time." A note was made of an "abrasion to right leg from knee to hip," but Blevins did not testify at trial about this scrape to his thigh, nor do the records indicate any complaint that it hurt. The ED notes, which were electronically signed by Dr. Richard Dixon, stated that Blevins had no other symptoms at the time beyond what were reflected. A CT scan was performed; it showed soft-tissue swelling over the left side of Blevins's head. At trial, Blevins did not testify about the swelling or about the hematoma to his head, although his wife testified that he "still has a lump" from the collision.

The hospital records also indicate that Blevins scored a near-perfect total on the 15-point Glasgow coma scale, a test Blevins's expert described as a "measure of awareness, of alertness." As Dr. Houtz acknowledged on cross-

9

examination, Blevins's assessment at 14 indicated a "relatively mild" head injury.[6]

Blevins was sent home from Harris Hospital a few hours later, with prescriptions for Lortab (a pain reliever composed of hydrocodone and acetaminophen) and Phenergan (an anti-nausea medication). The hospital's discharge summary stated that Blevins had "a head injury which does not appear serious at this time. A *concussion* is a state of changed mental ability, usually from a blow to the head." The discharge paperwork also listed several "minor symptoms" that might occur, usually within the first 24 hours, followed by these admonishments: "If you experience any of these problems, you should not be alarmed. A concussion requires a few days for recovery. Many patients with head injuries frequently experience such symptoms. Usually, these problems disappear without medical care." Blevins was instructed to "notify [his] caregiver" if the symptoms lasted for more than one day. The discharge paperwork affirmed that, "[t]he condition of the patient at this time is good." The discharge summary also noted that Blevins had "had a previous head injury that may be causing some long lasting symptoms such as headache and dizziness."

---

[6]After a lunch break, on re-direct Dr. Houtz clarified that a person can score 15 out of 15 and "still have a serious brain injury that's going to cause problems the rest of their life," and that he in fact found it "very significant" that Blevins did not receive a perfect score.

At trial, Blevins specifically mentioned a concussion only once:

> Q.     After this collision, did you have hearing problems?
>
> A.     Yes.
>
> Q.     And can you tell the jury about that, how -- when you first realized you had problems.
>
> A.     Well, I was -- I can't remember exactly when we noticed that, but I was kind of -- You know, with a concussion, there was a period of time where there was this time and space thing, so I'm not sure. And what I mean by that was, there -- the -- the gentleman in the emergency room said that --

A hearsay objection was sustained at that point, and Blevins went on to testify not about any concussion-related cognitive issues, but rather that it was "weeks after that was when I started noticing that I could hear again."

*October and November 2011: post-accident medical care*

As noted, Texas Neurology had performed an MRI on October 5, three days after Blevins's wreck. Blevins then saw his neurologist, Dr. Nolan Jenevein, on October 10, 2011, when he returned to Texas Neurology for what the Progress Note shows as "[f]ollow up MRI concussion."

Dr. Jenevein noted that "MRI brain shows subgaleal hematoma, several millimeters thick over the left frontal parietal region. Intracranially the MRI scan shows no abnormalities." At this visit Blevins apparently did not complain of any cognitive difficulties, and his "cortical functions" were described as "alert and oriented X 3, comprehension and language intact, general knowledge and judgement

with normal variation, speech fluent." Dr. Jenevein also noted that Blevins was declining to take his recommended antiseizure medication.[7] (And although at trial Blevins testified that he continued to see Dr. Jenevein after the wreck and talked to him about the mental changes he had experienced as a result, the medical records do not support that assertion.)

On October 25, 2011, Blevins went to the Medical Clinic of North Texas, where he had been a patient since 2006. His complaint at that visit was "joint/neck/back pain," and he reported taking Lortab "occasionally" for pain relief. The MCNT physician's assistant recorded the fact of a "bad MVA" on October 2 and that Blevins "was [diagnosed] with a concussion and sent home with lortab 7.5/500 and phenergan." The October 25 medical record indicates that MCNT "will refer to back specialist if pain persists."

The next day, though, on October 26, 2011, Blevins visited Labrecque Family Chiropractic, where he self-reported that he had suffered a "severe" concussion. Blevins's chief complaints were "daily headaches, bilateral neck pain, constant mid

---

[7]Blevins returned to Texas Neurology in May 2012 for continuing monitoring of his seizure disorder, for which he continued to decline to take medication. The physician's assistant's report of Blevins's cortical functions was the same in May 2012 as Dr. Jenevein's from October 2011.

back pain and [stiffness,] daily bilateral knee pain and right hip pain." He then embarked on a roughly two-months-long series of regular chiropractic treatments.[8]

About halfway into his course of chiropractic treatments, on November 17, 2011, Blevins also became a new patient at Arlington Orthopedic Associates, where his chief complaint was "neck pain."[9] As he did with Labrecque Family Chiropractic, Blevins reported that he had suffered a "severe concussion" from the accident. As with Blevins's other medical records, the Arlington Orthopedic Associates records do not reflect that Blevins reported or exhibited any cognitive difficulties.

*2012: Blevins files suit*

The record does not give the exact date, but sometime before November 12, 2012—the date on which Olivia Head filed her original answer—Blevins sued Head and Lesley Matos, the drivers of the two cars that had hit him on October 2, 2011. (State Farm was added as a defendant in May 2016.)

*July 2013: Andrew Houtz, Ph.D. evaluation; May 2017 trial testimony*

At least eight months after filing this lawsuit, and nearly two years after the accident, Blevins was referred by his counsel to Andrew Houtz, Ph.D., for a

---

[8]Two years later, in November 2013, Blevins saw another chiropractor. He reported at that time that he could "concentrate fully" when he wanted to "with slight difficulty," and on a scale of zero to ten, Blevins reported a zero in the category of feeling tense, uptight, or irritable or having difficulty concentrating.

[9]The records suggest that this was a referral from MCNT to Arlington Orthopedics as a follow-through on MCNT's October 25 notation.

neuropsychological evaluation to "assess his current level of neuropsychological functioning, identify cognitive strengths and limitations, evaluate for residual cognitive deficits secondary to a closed head injury, and obtain additional psychological data for differential diagnosis and appropriate treatment planning." According to Dr. Houtz's July 31, 2013 evaluation, Blevins reported having sustained a "severe" concussion and reported "multiple changes in cognition since the accident," including difficulty with remembering daily tasks and business-contact information and with following conversations; personality changes such as increased irritability; and taking longer to process information, losing his train of thought, and having problems with multitasking. Dr. Houtz's written report concluded, among other things, that "[g]iven [Blevins's] report of normal cognitive and emotional functioning prior to the car accident, there does appear to be evidence of residual head trauma sequelae impacting his daily functioning."

Dr. Houtz spent an hour talking with Blevins and three hours administering tests; the July 2013 appointment was their sole interaction, and Dr. Houtz did not treat Blevins. At trial, Dr. Houtz acknowledged that he had not interviewed Blevins's wife or any co-workers but that the "historical aspect" came only from Blevins—that is, from what he self-reported. Dr. Houtz concluded that Blevins was "having ongoing cognitive deficits" in July 2013 and that those "residual cognitive deficits" were the result of the accident. Dr. Houtz also opined that Blevins had suffered a

14

traumatic brain injury in the October 2011 accident that resulted in permanent deficits.

In his testimony on direct, Dr. Houtz represented to the jury that Blevins had had an intracranial hemorrhage and bleeding underneath the surface of the skull, which to Dr. Houtz was "fairly conclusive, objective evidence" that Blevins had suffered a "blow . . . to the brain." Dr. Houtz also found it significant that Blevins had been knocked out and was unconscious for a period of time, testifying that "[e]ven when [Blevins] regained consciousness, he experienced a period of confusion and disorientation, which, again, lets us know that his brain was not processing the way it should have been for a period of time after the head injury."

Dr. Houtz also told the jury that his previous review of Blevins's medical records had shown a diagnosis of a "severe concussion"[10] and included reported symptoms "consistent with that severe concussion since the time of this wreck." But on cross-examination, Dr. Houtz conceded that—

- he did not actually recall having seen any medical records describing Blevins's concussion as "severe";

- he had not seen the Texas Neurology records or Blevins's MRI results;

- although he had thought that Blevins had had some "brain bleeding" as a result of the accident, the records do not actually show that; and

_____

[10]Blevins's wife also testified that he was "diagnosed with a severe concussion," despite the fact that no healthcare provider ever made such a diagnosis.

15

- Dr. Houtz's recollection of Blevins's having had a "subdural hematoma or some type of bleed" in the space between the skull and the brain was also not supported by the medical records.

Dr. Houtz was unaware of Blevins's having passed out and having struck his head on a concrete floor in 2006. Moreover, Blevins did not tell Dr. Houtz about the warehouse incident, about dystonia in his left wrist, about excessive sleepiness during the day, about bilateral hearing loss, or about a second episode of falling and losing consciousness, all as shown in the (unreviewed) Texas Neurology records. Dr. Houtz acknowledged that severe sleep apnea will "[t]ypically . . . cause memory problems and attention and concentration difficulties."

Also on cross-examination, Dr. Houtz agreed that he did not feel Blevins's head for a "goose egg," nor did he remember if Blevins had mentioned a "goose egg" during their session. Dr. Houtz did not think that Blevins had mentioned any neck or back pain either.

Dr. Houtz similarly had not reviewed the 2006 MCNT records in which Dr. Bailey had recorded Blevins's hesitancy to be without his wife at his side since his seizure, his struggles with fears at night, symptoms of anhedonia and tearfulness, difficulty in making decisions, and other problems; nor did Blevins tell Dr. Houtz of those issues. In fact, Dr. Houtz admitted that he was not even aware of these and other medical records until reviewing them for the first time over the lunch break that came between cross-examination and his redirect testimony.

16

On redirect, and after then having seen Blevins's medical records, Dr. Houtz explained that even a "mild" traumatic brain injury can have devastating consequences on someone's life, and that "mild" refers to being unconscious for less than an hour. On the other hand, Dr. Houtz opined, someone could have a "severe" traumatic brain injury in which they were in a coma for a week, for example, but wake up and be cognitively fine. That is, "[a] person can have a mild traumatic brain injury but have a devastating brain injury nonetheless, just like someone could have a severe traumatic brain injury and have no deficits."[11] Dr. Houtz went on to distinguish between a head injury and a brain injury, with the former being "some kind of an insult to the head" but one that "may not transmit enough kinetic force to cause actual damage to the tissue of the brain."

On further cross-examination, Dr. Houtz acknowledged that Blevins's subgaleal hematoma, which was a bruise or "goose egg," was outside the cranium rather than intracranial; was several millimeters thick, or about the width of a large paperclip; and seems to have "spontaneously resolved" several days later. It was not "something that was bleeding." Dr. Houtz also agreed that Blevins's neurologist did not change anything about his treatment following the accident.

---

[11]This shift in terminology appears to have been an effort to reconcile Dr. Houtz's earlier testimony with the contents of the medical records, which were at odds in many respects.

17

*Course of proceedings*

The only trial witnesses were Blevins himself; his wife, Jenna; Elizabeth O'Rear, a witness to the accident; and Dr. Houtz. State Farm rested without putting on any evidence in its case in chief.

The jury found negligence and proximate cause in connection with Olivia Head but not Lesley Matos. The jury was not asked to compensate Blevins for any economic damages such as medical expenses or lost wages, and for each of the noneconomic-damages categories submitted to the jury, it returned a finding of zero damages. Blevins unsuccessfully moved for a new trial, and this appeal followed.

## ISSUES ONE & TWO
### *Evidentiary Sufficiency*

**Standards of Review; Legal Principles**

To successfully challenge the legal sufficiency of a factfinder's determination that the challenging party failed to meet its burden of proof, that party "must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts" necessary to meet the burden of proof. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). We begin our review by examining only the evidence that supports the challenged finding, ignoring all evidence to the contrary. *Id.* If no evidence supports the factfinder's finding, we then examine the entire record to see if the contrary proposition is established as a matter of law. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989). Unless the evidence conclusively establishes the

18

opposite conclusion as a matter of law, we will affirm the finding. *Dow Chem.*, 46 S.W.3d at 241 (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983)). In the end, we must decide "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).

Here, although Blevins raised a separate legal-sufficiency issue and mentions in passing the "as a matter of law" standard, he has asked only for a remand and has not identified where in the record his non-economic damages were ostensibly established as a matter of law. Accordingly, we will evaluate his evidentiary issues only for factual sufficiency.

In a factual-sufficiency challenge to an adverse finding on which the challenging party had the burden of proof, such as to establish its damages, that party "must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *Dow Chem.*, 46 S.W.3d at 242. We consider and weigh all the evidence and will uphold the challenged finding unless it is "so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id.* The amount of evidence needed to show that factually sufficient evidence *supports* a jury finding is "far less" than the amount needed to conclude that a finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *In re State Farm Mut. Auto. Ins. Co.*, 483 S.W.3d 249, 263 (Tex. App.—Fort Worth 2016, orig. proceeding) (finding trial court's grant of plaintiff's motion for new

19

trial to be abuse of discretion where jury awarded zero damages in UM/UIM case for past physical pain and suffering following low-speed collision); *GTE Mobilnet of S. Tex. v. Pascouet*, 61 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

Moreover, a jury has "great discretion" in considering damages-related evidence, and it is particularly within the jury's province to resolve necessarily speculative matters such as pain and mental anguish and to decide what amounts (if any) to award for such things. *State Farm*, 483 S.W.3d at 263; *Grant v. Cruz*, 406 S.W.3d 358, 363 (Tex. App.—Dallas 2013, no pet.). But when testimony about pain and mental anguish is accompanied by uncontroverted, objective evidence of an injury— for an obvious example, loss of a limb, or broken bones—appellate courts are more likely to overturn a zero-damages award for past pain and mental anguish. *State Farm*, 483 S.W.3d at 263 (citing cases).

But "more likely" does not necessarily mean "must." *See Lanier v. E. Founds., Inc.*, 401 S.W.3d 445, 456 (Tex. App.—Dallas 2013, no pet.) ("[C]ourts have upheld jury awards of zero damages when both subjective and objective evidence of injuries existed, so long as the jury's verdict was not so against the great weight of the evidence as to be manifestly unjust."); *Lehmann v. Wieghat*, 917 S.W.2d 379, 384– 85 (Tex. App.—Houston [14th Dist.] 1996, writ denied) ("There are cases that uphold jury findings of no damages for pain and suffering, despite other findings and evidence of injury and damages."). Even objective evidence of an injury does not mandate a damages award if the injury is "less serious and accompanied only by

subjective complaints of pain," particularly where an award of past medical expenses is made. *State Farm*, 483 S.W.3d at 264; *see also Enright v. Goodman Distrib., Inc.*, 330 S.W.3d 392, 397 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (observing that "[s]ome objective injuries are so significant that an award of damages for physical pain is mandated."); *Blizzard v. Nationwide Mut. Fire Ins. Co.*, 756 S.W.2d 801, 805 (Tex. App.—Dallas 1988, no writ); *McGuffin v. Terrell*, 732 S.W.2d 425, 428 (Tex. App.—Fort Worth 1987, no writ) (noting that jury evidently found injury "so minimal as to not warrant an award for past pain and suffering" despite awarding medical expenses for treatment of muscle spasms); *cf. Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 775 (Tex. 2003) (observing, in dicta, that zero-damages award for pain and suffering would not necessarily be upheld on appeal "if there is objective, undisputed evidence of a *significant* injury and the jury could not have compensated the injured party in some other category of damages" (emphasis added)).

Texas jurisprudence no longer adheres uncritically, if it ever did, to the so-called "zero-damages rule,"[12] which the supreme court has neither adopted nor disavowed. *See Golden Eagle Archery*, 116 S.W.3d at 777 (O'Neill, J., concurring) (urging the court to take the opportunity to "expressly disavow" the "zero damages" rule because under it a reviewing court "does not consider and weigh all of the evidence in

---

[12] *Pilkington v. Kornell*, 822 S.W.2d 223, 225 (Tex. App.—Dallas 1991, writ denied) ("The so called 'zero damages rule' dictates, in its most basic application, that, in cases involving unliquidated damages, the jury *must* award something for every element of damage 'proved,' or else the case will be remanded for a new trial.").

the case (both that which tends to support the jury's finding and that which does not), state in what regard the contrary evidence greatly outweighs the evidence that supports the verdict, or explain why the jury's finding shocks the conscience or clearly demonstrates bias, as *Pool* requires"). And really, it is not even a rule of damages. Rather, it is a "misnomer" that has "crept into Texas jurisprudence" and that refers to a plaintiff's challenge to a jury's negative damage finding based on the great weight and preponderance of the evidence. *Estrada v. Dillon*, 23 S.W.3d 422, 426 (Tex. App.—Amarillo 2000), *aff'd in part, rev'd in part on other grounds*, 44 S.W.3d 558 (Tex. 2001). In a factual-sufficiency review, we simply weigh all the evidence to determine whether a particular damages finding bucks the great weight and preponderance of that evidence. *See Golden Eagle Archery*, 116 S.W.3d at 761 (citing *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g)). And not just goes against the great weight—it must do so in a way that is manifestly unjust, shocks the conscience, or clearly demonstrates bias. *Id.*

We must also keep in mind that it is the jury, and the jury alone, that judges the witnesses' credibility and the weight to give their testimony. *Id.* In performing that role, the jury may believe one witness and disbelieve others, just as it may resolve inconsistencies in any witness's testimony. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986).

## Discussion

This case is unusual in that the record contains some evidence that Blevins had a concussion, an abrasion on his leg, bruising on his face, and a hematoma and associated swelling on his head—all of which can be fairly characterized as objective injuries. *See, e.g.*, *Hammett v. Zimmerman*, 804 S.W.2d 663, 666 (Tex. App.—Fort Worth 1991, no writ). But Blevins never set the stage for an award of damages for those injuries by testifying about them (except in passing, if at all); he focused instead on a notional permanent brain injury. In fact, it was State Farm that walked Dr. Houtz through the medical records as part of its effort to impeach him about the existence of a brain bleed and a traumatic brain injury, and (except for Blevins's one-line testimony that his face was bruised by the air bag) it was within those records that the evidence of objective injuries appeared.[13] Given the way the case was tried, we see our inquiry as essentially two-fold:

- Was it wrong for the jury to reject Blevins's claim of a traumatic brain injury with lasting effects by awarding no damages?

- Was the evidence of objective injuries such that the jury had no choice but to have awarded some non-economic damages for pain and mental anguish, disfigurement, or physical impairment?

---

[13]Neither Blevins nor his wife referred to the contents of his preadmitted medical-record exhibits. The first mention of them came during State Farm's cross-examination of Dr. Houtz.

23

*Traumatic brain injury with permanent effects*

In reviewing and weighing the evidence that the jury had before it, when considering Blevins's claim of a traumatic brain injury we cannot conclude that the jury's zero-damages answers were so against the great weight and preponderance of the evidence as to be manifestly unjust. Blevins's own descriptions of his cognitive problems were vague:

- Before the accident, he and his son would go on "adventures," but "it's become a different kind of issue because . . . as [Nathanael has] gotten older, he can see the differences in" Blevins, and after the wreck they "couldn't do" the adventures because Blevins was "having issues with getting lost when we were going places."

- Although the company Blevins works for has been "really great," he has to keep "meticulous notes" and make reminders for himself and write down names when meeting someone because his short-term memory is affected, which produces fear of being found out.

- Work causes "a lot of anxiety" because he knows that a "customer is not a friend" but is instead someone to be served to the best of his ability; it is critical that his customers in the lighting business know they can count on him to fix systems.

- When things happen with work, "it's just more [him] being so freaked out about it. But it's -- That question is always looming, you know, 'Well, what happens if -- if it becomes all the time?'"

- As far as Blevins's home life is concerned, his frustration with himself "bleeds over to [their] relationship -- Jenna and [his] relationship with" Nathanael; Blevins worries that his own stress spills over, and he does not want his son to have memories of yelling, as Blevins did with his own father.

- Blevins is frustrated at the unpredictable nature of being able to remember some things but not others, and at his interactions with people when they remind him that a conversation already occurred.

- He has "lost some" of who he was, which is a burden on his wife and son; it is "just a scary time" and memory is "just not there."

- At the time of trial, Blevins was studying for a particular certification in the lighting industry but was finding it difficult.

Blevins's wife also testified to his memory problems and frustrations, although those issues had improved over the years. Asked whether there is a "night and day difference in the Bill Blevins that the jury sees versus the one that existed prior to this wreck," Mrs. Blevins responded, "That the jury would see at this point in time, six years after the accident, I would say, no, you can't see it; but I can see it, and Nathanael can see it, and my parents can see it. He's not the same person." She also testified that he continued to get better "over the course of a few years" but also that between his working all day and then doing brain-related exercises like word games at night, she felt as if "it's almost like [she was] not just parenting" Nathanael herself but also having to do Blevins's parenting as well.

As noted, Dr. Houtz saw Blevins only once, after suit had been filed, an appointment from which he prepared his expert report that was introduced at trial. Dr. Houtz did not review Blevins's medical records in connection with preparing that report, did not interview Mrs. Blevins or any of Blevins's co-workers about their observations of his cognitive functioning before and after the wreck, and accepted

25

Blevins's self-reporting of a "severe" concussion and accident-related cognitive problems.

Although on appeal Blevins argues that Dr. Houtz's testimony about Blevins's "brain injury" was "uncontradicted," we think the jury could reasonably have concluded otherwise in light of State Farm's repeatedly impeaching Dr. Houtz during its cross- and recross-examination. *See Hunter v. Ford Motor Co.*, 305 S.W.3d 202, 208 (Tex. App.—Waco 2009, no pet.) (stating that expert testimony about a subject matter that is for experts alone "may be contradicted by the testimony of other witnesses *or by cross-examination* of the expert witness") (emphasis added); *Liberty Mut. Ins. Co. v. Burk*, 295 S.W.3d 771, 779–80 (Tex. App.—Fort Worth 2009, no pet.) (disagreeing that medical expert's testimony was uncontradicted and therefore conclusive where that testimony was "internally inconsistent"; statements on cross-examination differed from those on direct); *Truck Ins. Exch. v. Smetak*, 102 S.W.3d 851, 855 (Tex. App.—Dallas 2003, no pet.) (stating that expert testimony may be contradicted through cross-examination). To the extent that Blevins sought non-economic damages for a permanent traumatic brain injury that lacked objective support in the record, we conclude that the jury's findings of zero damages were not contrary to the great weight and preponderance of the evidence, nor were those findings manifestly unjust.

*Objective injuries reflected in the medical records*

In addition to what Blevins did and did not testify to concerning injuries unrelated to his alleged brain trauma with cognitive deficits—testimony that was scant at best—the hearing on Blevins's motion for new trial underscored what his approach to damages had been at trial:

> Court:  As I recall, and I may not recall everything, I mean, you certainly didn't argue that they ought to be given a certain amount of money for the hematoma on the head. As I recall, your arguments were he ought to be awarded a million dollars or up to a million dollars and no less than 300,000. And that was based upon this theory of a closed-head injury, which I think the jury could reject it.

> Blevins's Counsel:  I believe you're right that the jury could reject that there was a post-head injury with lingering ongoing cognitive deficits. I don't believe that the jury could reject that there were past cognitive deficits because there is uncontroverted, unchallenged evidence. . . .

> But, Your Honor, I don't think I told the jury, even though I did, you know, request a large amount of money, of course it was based on my belief that there was an ongoing cognitive issue. I didn't tell them to discount other injuries that he suffered that may have supported a much lower verdict amount.

As State Farm points out, this exchange does not suggest that Blevins ever actually asked the jury to award non-economic damages for any of his other, objective injuries such as the concussion, the bruise and swelling on his head, or the abrasion on his leg. But regardless of whether Blevins might have made such a request in his closing argument—which does not seem to be the case, and he certainly did not do so

in his opening—we cannot conclude from this record that Blevins sustained a serious or significant objective injury for which the jury was obligated to compensate him.

It is true that a concussion, hematomas, and an abrasion are objective injuries. *See, e.g., Hammett*, 804 S.W.2d at 666 (collecting cases). And it is true that Blevins briefly lost consciousness in the accident and was confused for a time afterward. But if Blevins urged at trial that those limited and relatively insignificant injuries (compared to his traumatic-brain-injury claim) warranted an award of damages, the record does not show it. Blevins testified to pain in his back and neck for which he sought treatment; the Arlington Orthopedic Associates record dated November 17, 2011, indicates that he "started developing neck pain about three weeks" after the accident. Blevins otherwise spoke only of having injured his shoulder, having bruising on his face from the air bags, and perhaps "one of [his] knees or legs was hurting, [his] right leg, maybe."

In light of Blevins's very limited testimony concerning physical pain, which did not even involve the bruise and bump on the top of his head or his leg scrape, we conclude that the jury properly exercised its discretion by not awarding damages for past and future physical pain and mental anguish. Put differently, the jury's decision is not contrary to the great weight and preponderance of the evidence, nor do we see it as manifestly unjust or shocking, upon these facts. *See In re Orren*, 533 S.W.3d 926, 930 (Tex. App.—Tyler 2017, orig. proceeding) (noting that "where the evidence of pain is conflicting, scant, or more subjective than objective, appellate courts are

28

generally more reluctant to determine a jury finding of no damages is contrary to the great weight and preponderance of the evidence").

In the typical personal-injury case in which a zero-damages award for pain and suffering is affirmed despite objective injuries, the jury has been afforded the opportunity to compensate the injured party through an award of medical expenses even while also concluding that the injured party "never suffered pain warranting a money award." *State Farm*, 483 S.W.3d at 264 (quoting *Blizzard*, 756 S.W.2d at 805). In that way, a party is compensated for "seeking enough medical care to ensure that [the] injury was not serious." *Id.* (quoting *Blizzard*, 756 S.W.2d at 805).

Here, though, Blevins did not seek to recover his medical expenses; Mrs. Blevins testified that their health insurer had paid Blevins's medical bills and that no bills remained unpaid.[14] But simply because the jury had no opportunity or need to compensate Blevins for seeking medical attention does not mean that it was thereby required to compensate him for pain and mental anguish arising from his relatively minor objective injuries.

The jury also declined to award damages for past and future disfigurement or for past and future physical impairment. As part of our evidentiary-sufficiency review,

---

[14]The trial court allowed this line of cross-examination after Mrs. Blevins testified on direct that "[o]ne of the things that I thought about as far as insurance covering things, medical insurance doesn't always cover everything. Even things that are recommended that you do, insurance doesn't always cover those expenses, and sometimes you can't do them because of those expenses."

we must consider the evidence unique to each category of non-economic damages. *Golden Eagle Archery*, 116 S.W.3d at 773.

"Disfigurement" is recognized as "that which impairs the appearance of a person, or that which renders unsightly, misshapen or imperfect, or deforms in some manner." *Doctor v. Pardue*, 186 S.W.3d 4, 18 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). On appeal, Blevins does not direct us to any evidence in the record of disfigurement, maintaining only that his injuries were "necessarily accompanied" by disfigurement and that State Farm did not contest the "obvious fact" that Blevins suffered disfigurement. Nevertheless, assuming that evidence of a goose egg, facial bruising, and a scrape on the leg would constitute evidence of disfigurement, whether to award compensation for those injuries is for the jury to decide. *See Fajardo v. Fuentes*, No. 01-10-00650-CV, 2011 WL 4500843, at *2–3 (Tex. App.—Houston [1st Dist.] Sept. 29, 2011, no pet.) (mem. op.) (noting that disfigurement damages are "necessarily speculative" and affirming zero-damages award for claimed disfigurement from abdominal bruises). Given the jury's broad discretion, we cannot say that its failure to award disfigurement damages was against the great weight and preponderance of the evidence.

The same is true of physical impairment, a damages category that encompasses loss of the injured party's former lifestyle, the effect of which "must be substantial and extend beyond pain, suffering, mental anguish, lost wages or diminished earning capacity." *Golden Eagle Archery*, 116 S.W.3d at 772. To recover such damages, a

30

claimant must prove that (1) he incurred injuries that are distinct from, or extend beyond, injuries compensable through other damage elements; and (2) these distinct injuries have had a "substantial" effect. *Enright*, 330 S.W.3d at 402. Here too, Blevins says only that his injuries were "necessarily accompanied" by physical impairment and that State Farm did not contest the "obvious fact" of physical impairment. But our independent review of the record has turned up no evidence of physical impairment, as cases define that term, and so we cannot conclude that the jury went against the great weight and preponderance of the evidence in such a way as to show a manifest injustice.

We overrule Blevins's first two issues.

## ISSUES THREE & FOUR
### *What a Jury Should Know About UIM Coverage*

**Standards of Review; Legal Principles**

Blevins's last two issues, which he briefed together and which we will analyze together, deal with what and how much a jury should hear about UIM coverage in a case like this. Blevins maintains that the trial court erred by quashing his trial subpoena for a State Farm representative to appear, and also by declining to expand on a jury instruction about Blevins's UIM coverage.

We review both issues for an abuse of discretion. *See Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006) (submission or refusal of jury instruction in charge); *State v. Bristol Hotel Asset Co.*, 65 S.W.3d 638, 647 (Tex. 2001) (exclusion of evidence).

31

A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or without reference to any guiding rules and principles. *Villarreal v. Fowler*, 526 S.W.3d 633, 635 (Tex. App.—Fort Worth 2017, no pet.). Error is reversible only if it probably caused the rendition of an improper judgment or prevented the appellant from properly presenting his case to the appellate court. *See* Tex. R. App. P. 44.1(a); *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 225 (Tex. 2005).

Trials involving UIM coverage are unique in that before an insured like Blevins is entitled to any UIM benefits under his policy, he must first establish the other driver's negligence and his own damages. *See Liberty Mut. Ins. Co. v. Sims*, No. 12-14-00123-CV, 2015 WL 7770166, at *6 (Tex. App.—Tyler Dec. 3, 2015, pet. denied) (mem. op.) ("[A] UIM insurer has no contractual duty to pay benefits until after the liability of the insured and the other motorist, as well as the damages suffered by the insured, have been determined.") (citing *Brainard v. Trinity Universal Ins. Co.*, 216 S.W.3d 809, 815 (Tex. 2006)). A party such as Blevins must only plead and prove that, at the time of the accident, he was protected by UIM coverage. *See, e.g., Members Mut. Ins. Co. v. Olguin*, 462 S.W.2d 348, 350 (Tex. Civ. App.—El Paso 1970, no writ). It is only after an insured has obtained findings that the other motorist was negligent (or more negligent than the insured) and that he sustained damages that the trial court needs to take up the UIM issue. *See Mid-Century Ins. Co. of Tex. v. McLain*, No. 11-08-00097-CV, 2010 WL 851407, at *1, *3 (Tex. App.—Eastland Mar. 11, 2010, no pet.) (mem. op.).

> Implicit in this rule is that, after the jury's verdict, one or both parties will present evidence to the court on UIM coverage limits, liability policy limits of the other motorist, and any other payments received by the insured for which the UIM carrier is entitled to credit. This information is necessary for the trial court to enter a judgment based on the issues answered by the jury and those the court determines as a matter of law.

*Sims*, 2015 WL 7770166, at *6. As a consequence, such evidence is "not relevant to the controversy resolved by the jury" and is "best heard at a hearing after the verdict . . . ." *Id.*

And while it is true that a plaintiff must prove the existence of UIM coverage—and hence that "injection of insurance is unavoidable in UIM cases"—that reality does not mean that evidence of the UIM coverage limits is admissible. *Id.* at *8.

Here, State Farm and Blevins stipulated that he had such coverage, meaning that Blevins had no need to "prove" it in the sense of introducing the policy itself.[15] For the trial court's use, State Farm read a stipulation into the record at the beginning of the second day of trial:

> The parties stipulate that Olivia Head and Lesley Matos were previous parties to this lawsuit, whose claims were settled.
>
> Olivia Head was insured by a liability policy providing $30,007 of coverage. And that policy was tendered in exchange for a full release with consent by State Farm.
>
> Lesley Matos was insured by a liability policy providing $100,000 in liability coverage. Ms. Matos settled her claim with the

---

[15]The jury was instructed that "State Farm issued a policy to William Blevins providing coverage for UM/UIM damages and that such policy was in effect on October 2, 2011, the date of the collision at issue."

33

plaintiff, agreeing to pay $40,000 in exchange for the full release with consent from State Farm.

State Farm stipulates that Bill Blevins was insured by a UIM/UM policy providing $100,000 per person in coverage, and that policy was in effect on October 2nd, 2011.

The parties further stipulate that there are no other policies of insurance or bonds that would cover Olivia Head and Lesley Matos for the occurrence at issue and damages to the plaintiff caused by their negligence.

As the *Sims* court recognized, it is improper for a jury to know policy limits for either an allegedly underinsured driver or the UIM-policy insured:

One reason for not allowing evidence of the other motorist's liability limits is to prevent the jury from knowing the threshold over which the UIM carrier may have a contractual obligation to pay. The same reasoning applies to the introduction of UIM policy limit amounts, because the jury's knowledge of that amount could affect its damages verdict.

*Id.*

Because it would have been improper for the jury to have heard much about Blevins's UIM coverage, and because applying its terms would have been a job for the trial court if Blevins had gotten a favorable jury verdict on damages, we disagree with Blevins that a State Farm representative should have testified at trial. His trial subpoena contained twelve categories of information, none of which bore on the sole issues for trial: (1) the relative liability of Olivia Head and Lesley Matos, and (2) Blevins's damages. Although Blevins argues that he should have been allowed to question a State Farm representative in his "breach of contract" case, he did not (yet)

34

have any contract claims to pursue: State Farm would have breached a contract only if it refused to pay UIM benefits after their amounts were established, such as by a favorable jury verdict in this lawsuit. *See Brainard*, 216 S.W.3d at 818 (recognizing that UIM insurer is "under no contractual duty to pay benefits until the insured obtains a judgment establishing the liability and underinsured status of the other motorist" and that "[n]either requesting UIM benefits nor filing suit against the insurer triggers a contractual duty to pay").

Blevins argued below that a corporate representative could have confirmed that the non-economic damages he sought were of the sort covered by the UIM provision. But as State Farm points out, the policy language—which, as statutorily required, tracks section 1952.106 of the insurance code—refers to damages that an insured is "legally entitled to recover" and does not use such terms as "pain and mental anguish," "disfigurement," or "physical impairment," which were of course what the jury was asked about in the verdict form. Consequently, any testimony from a State Farm representative about what damages the UIM policy covered would have been improper. More fundamentally, it is for the trial court, not the jury, to decide what sorts of damages a litigant is legally entitled to recover. *Pressil v. Gibson*, 477 S.W.3d 402, 408 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) ("Whether damages or particular remedies are available to a plaintiff is a question of law."). We conclude that the trial court did not abuse its discretion by quashing Blevins's trial subpoena, and we therefore overrule his third issue.

35

As for Blevins's final issue concerning the trial court's failure to give his requested jury instruction, that issue was not preserved for appeal. Blevins apparently asked for a "part two" to the instruction that was actually given. The instruction given was: "State Farm issued a policy to William Blevins providing coverage for UM/UIM damages and that such policy was in effect on October 2, 2011, the date of the collision at issue." Although the record does not contain the exact language that Blevins sought to include as part two, from the parties' discussions on the record of proposed stipulations at the trial's beginning, we understand that he wanted a second jury instruction to this effect: that "the parties further stipulate that William Blevins' UM/UIM policy provided coverage up to the limit of his policy for damages, if any, that were caused in this collision and for which there was no coverage, or insufficient coverage, on the liability policy or policies of the at-fault driver or drivers." That language was never submitted in written form either as a suggested stipulation or as a requested jury instruction.

Blevins failed to preserve error, if any, in the omission of an instruction along the lines of the above language. His proposed jury questions and instructions that appear in the clerk's record did not contain any instruction at all about UIM coverage, nor does the record contain the proposed written charge that the parties discussed at the close of all evidence and that ostensibly contained a secondary instruction similar to the above proposed stipulation. After the trial court announced that it would take out the "second part," Blevins's counsel said this:

Your Honor, plaintiffs have requested an instruction that the jury be informed that the UIM/UM policy that Mr. Blevins purchased provided coverage for all of the damages, if any, that they're going to assign dollar figures to when they're answering the questions. I think that's important, because the jury knows that this is a case that's against State Farm. And there was expression during this trial that – that they didn't understand why State Farm would be responsible for damages caused by unrelated third parties.[16] This is just an attempt to, first of all, help the plaintiff meet their burden of proving up coverage as well as just to let the jury know the reasons that State Farm is in the lawsuit so that they understand the damages are covered by the UM policy.

Rule 278 provides that "[f]ailure to submit a definition or instruction shall not be deemed a ground for reversal of the judgment unless a substantially correct definition or instruction has been requested in writing and tendered by the party complaining of the judgment." Tex. R. Civ. P. 278; *see Corpus Christi Day Cruise, LLC v. Christus Spohn Health Sys. Corp.*, 398 S.W.3d 303, 312 (Tex. App.—Corpus Christi 2012, pet. denied) (holding that judgment could not be reversed for failure to instruct jury on apparent authority, where appellant neither objected to the lack of such an instruction nor tendered a substantially correct instruction in writing to trial court); *Hall v. Hubco, Inc.*, 292 S.W.3d 22, 29 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (holding that any error in trial court's failing to instruct jury on law of contract formation was waived where complaining party did not offer proposed instruction in

---

[16]Several veniremembers were apparently confused during voir dire about why State Farm would have to be paying damages, and wanted to see exactly what the policy provided. According to State Farm, all prospective jurors voicing that sentiment were struck for cause.

writing). We thus conclude that Blevins has waived any complaint about the absence of "part two" of a jury instruction about UIM coverage and overrule his fourth issue.

## Conclusion

Having overruled each of Blevins's appellate issues, we affirm the judgment below.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered:  November 15, 2018